# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### AT LOUISVILLE


**LOUISVILLE/JEFFERSON COUNTY**
**METRO GOVERNMENT WASTE**
**MANAGEMENT DISTRICT**                                      **PLAINTIFF**

**vs.**                              **CIVIL ACTION NO.  3:17-CV-305-CRS**

**WASTE MANAGEMENT OF**
**KENTUCKY. LLC**                                            **DEFENDANT**


## MEMORANDUM OPINION

This case arose from a claim by plaintiff Louisville/Jefferson County Metro Government

Waste Management District (hereinafter "the District") that defendant Waste Management of

Kentucky, LLC (hereinafter "WMK") has been underpaying the landfill license fee owed to the

County for at least thirteen years, a claim which WMK staunchly denies. The action seeks (1)

recovery of unpaid portions of landfill license fees with prejudgment interest; (2) a declaration of

the rights and obligations between the parties, presently and going forward, with respect to

Louisville Metro Code of Ordinances ("LMCO") § 51.001, *et seq.* (LMCO Chapter 51, herein

generally "the Ordinance," and specific sections and subsections, as specified)  under which the

license fee is imposed; [1] and (3) an accounting of gross receipts of WMK. This matter is presently

before the court for consideration of cross-motions for summary judgment.

The parties agree that there is no genuine issue of material fact concerning how WMK

made its quarterly calculation of the gross receipts subject to the landfill license fee and its rationale

---

[1] The Complaint (DN 10-1) does not seek a declaratory judgment.  It does, however, contain the customary catch-all of "any and all other relief to which it may appear entitled."  DN 1-1, p. 4, ¶ 4.  The parties jointly seek this declaration of rights in their Agreed Statement of Facts.  DN 27, p. 11, ¶¶ 39-41. In any event, a determination of the rights and obligations of the parties under the statute and Ordinance is necessary in assessing the claim that the landfill license fee was underpaid.

for its method of calculation. The question is whether WMK has paid the appropriate amount in satisfaction of the Ordinance's requirements and whether the District may recover the amounts underpaid, if any.

As an initial matter, WMK asserts that the Ordinance is invalid and unenforceable in violation of the "Home Rule."[2] WMK contends that the Ordinance exceeds the authority granted to the County by statute and contains irreconcilable discrepancies which render it infirm. Additional WMK urges that the County's prior course of conduct bars the District from recovering on a claim for underpaid fees. Finally, it contends that any claim which seeks to reach beyond May 17, 2012 is barred by the applicable statute of limitations.

The parties filed an Agreed Statement of Facts, accompanied by a number of exhibits (DN 27). The cross-motions for summary judgment addressing those facts are now ripe for decision.

## I. Agreed Facts, in pertinent part

WMK owns and operates the Outer Loop Recycling & Disposal Facility ("Outer Loop Facility"). Agreed Statement of Facts, DN 27, p. 1, ¶ 1.[3] It was opened in 1969 and currently covers 782.10 acres, of which 518.30 acres are permitted for solid waste disposal in a landfill. *Id.* WMK engages in various activities on the property including disposal of solid waste, waste water treatment, composting, and capture of renewable natural gas. *Id.* These activities are permitted by the Kentucky Department for Environmental Protection, Division of Waste Management ("KDEP"). DN 27, ¶ 2. An "aerial map" appended to the Agreed Statement of Facts depicts the

---

[2] Section 156b of the Constitution of Kentucky affords the General Assembly the power to grant cities the authority to pass laws "in furtherance of a public purpose," provided that local ordinances do not conflict with a constitutional provision or statute. In turn, local governments including Louisville metro are vested with broad authority to enact such ordinances. This is commonly known as "Home Rule." *See Ky. Rest. Assoc. v. Louisville/Jefferson County Metro Government*, 501 S.W.3d 426 (Ky. 2016).

[3] Citation to the Agreed Statement of Facts will reference pertinent paragraphs of DN 27.

Outer Loop Facility as of January 2018.  DN 27, ¶ 5; Ex. 1.  The exhibit consists of an aerial photograph with superimposed notations identifying various points on the property such as "Compost Operations," "Waste Water Treatment Facility," and "Renewable Gas Facility."  There is no physical point or boundaries designated as "Landfill."  There is no legend or scale.  The exhibit appears to be offered for illustrative purposes only.

KRS 68.178, referred to by the parties as the "enabling statute," authorizes Kentucky counties to license the operation of off-site waste management facilities including landfills and permits them to charge a fee for these licenses. DN 27, ¶ 8.[4]  The text of the enabling statute is set out in section II below.

Louisville Metro Government adopted Chapter 51 of the Louisville Metro Code of Ordinances pursuant to statute KRS 68.178.  Ordinance No. 44 (the "Ordinance") repealed Chapter 51 relating to solid waste management and reenacted it as set forth in full in the Ordinance. DN 27, ¶ 10; Ord. No. 44, Series 2005, Section III. This version of Chapter 51 is the Ordinance in issue in this case.

WMK pays annual license fees for landfill operations, composting operations, and hauling/transportation operations pursuant to the Ordinance. DN 27, ¶ 6.  The fee for composting consists of a $100 application fee and a $100 annual renewal fee.  The fee for waste hauling is $100 per year plus $10 per waste collection vehicle operated by the licensee.  The fee for landfill operations is 5% per annum of the facility's gross receipts.   § 51.201(A) and (B).  DN 27, ¶ 10.

---

[4] KRS 68.178 also authorizes an urban-county council of an urban-county government to do the same. As Louisville is a City of the First Class, the reference to powers afforded an urban-county government are not relevant here and will be omitted.

Section 51.001 of the Ordinance defines "Gross Receipts" as "[t]he total amount of money or value or other consideration received or generated by engaging in the business or businesses defined in this Ordinance before any deductions related to the cost of doing business."

In August of 2011, in a meeting of the District's Advisory Committee, the "vagueness of the definition of Gross Receipts [in § 51.001] as it pertains to certain facilities" was raised and discussed. DN 27, ¶ 34; Meeting Minutes, Ex. 3. The Minutes indicate that "Discussion centered around the types of material and services that should be included in 'Gross Receipts' so that it encouraged 'reuse' and 'recycling' of solid waste but still captured what was due." *Id.* In November of 2015, the District Advisory Committee Group A was tasked with drafting language to potentially better define the term "Gross Receipts." DN 27, ¶ 35. The issue was researched, and the resulting report indicated that "in Jefferson County Gross Receipts are defined as any and all monies take [sic] in through business operations, sales, and services provided. Gross receipts are calculated before any deductions for business expenses have been made. There are no approved deductions for gross receipts." DN 27, Ex. 4. No update to the Ordinance was approved or enacted. DN 27, ¶ 35. The definition of "Gross Receipts" remains unchanged.

For the past thirteen years, WMK has submitted quarterly reports in connection with payment of the 5% license fee to the District, as required by § 51.204. DN 27, ¶ 14. Each report included a notation concerning WMK's method of calculating the gross receipts subject to the fee:

> Gross receipts are less receipts for recyclables, compost, revenue generating cover, bioremediation of petroleum contaminated soils, pretreatment facility (non-hazardous waste), non-hazardous liquid waste added to the bioreactor landfill, hauling (brokerage), container liners, weighing of vehicles, analytical, appliances, tire chips, fuel surcharge, landfill gas sales, the Old City of Louisville waste, and adjustments for billing corrections.

WMK has consistently excluded sums in fifteen specific categories, identified by line item in the spreadsheets appended to the parties' Agreed Statement of Facts, (DN 27, Ex. 2), in reaching

4

its quarterly report figures and the District has accepted WMK's payments, never questioning the calculations until 2016. DN 27, ¶¶ 15, 32, 33.

In July of 2016, the District notified WMK for the first time that it believed WMK was underpaying the landfill license fee. DN 27, ¶ 36. The parties attempted to resolve their disagreement concerning how the landfill license fee should be calculated, but negotiations were unsuccessful. *Id.* The District filed a complaint in the Jefferson County, Kentucky, Circuit Court on May 11, 2017 seeking to end the impasse. The matter was removed to this Court under our diversity jurisdiction. DN 27, ¶ 37.

## II.     The Ordinance and its Enabling Statute

The pertinent provisions[5] of the enabling statute, KRS 68.178, are as follows:

**68.178. County license fee for off-site waste management facilities – Use of proceeds.**

(1) The fiscal court of any county[6] may license off-site waste management facilities located within the county with the imposition of a license fee at a percentage rate not to exceed two percent (2%) per annum of the gross receipts of such a waste management facility owned or operated by self-employed individuals, partnerships, or corporations. The proceeds from the license fee shall be used to defray the general revenue requirements of the county where the facility is located. For purposes of assessing the license fee provided for in this section, off-site waste management shall consist of establishing and operating a facility whose principal purpose is treatment, storage, disposal, or a combination of these activities…

(2)(a) The fiscal court of a county, or an urban-county council of an urban-county government may license a solid waste landfill located within the county or urban-county area. The license fee may be set at not less than one cent ($0.01) but no more than fifty cents ($0.50) per ton of waste received by the landfill or set at up to five percent (5%) of gross receipts of the landfill…

   (c)  The proceeds from the license fee shall be used to defray the government services provided to the landfill, necessary clean-up operations or emergency response related to

---

[5] The Agreed Statement of Facts includes only the text of KRS 68.178(2)(a). We have included additional sections of the statute for context, or relate to arguments made by the parties in their briefs.
[6] For ease of reference in this opinion, the court will refer to the "County" in reference to the enactment of the Ordinance and the "District" when referring to the enforcing entity herein.

operation of the landfill or transporting waste to the landfill, necessary maintenance, improvement or construction of roads, and for the general revenue requirements of the county or urban-county government where the landfill is located…

(d) …The fee provided for in this subsection shall be in lieu of the provisions of subsection (1)…[7]

The Ordinance contains the following provisions:[8]

**WASTE MANAGEMENT DISTRICT**

**§ 51.100. CREATION OF DISTRICT.**

(A) There is a Waste Management District, which was created pursuant to KRS 109.041(13), KRS 109.115 and KRS 67.083(3), which includes in its jurisdiction all territory within the borders of the County and shall be called "Louisville/Jefferson County Metro Government Waste Management District."

**§ 51.105. POWERS AND DUTIES OF WASTE MANAGEMENT DISTRICT.**

(A) The Waste Management District shall have those powers and duties assigned to solid waste management districts under KRS Chapter 68.178 and 109 and 224…which powers include, but are not limited to, the powers and duties set forth in this ordinance.

… (H) The right to charge reasonable fees and rentals for providing and/or regulating solid waste management facilities in order to finance the district's operations, service its indebtedness and provide adequate funds for facility replacement. KRS 68.178 provides that the fiscal court of any county may license off-site waste management facilities located within the county with the imposition of a license fee. Therefore, pursuant to KRS 67C.101, the Metro Government has the authority to impose license fees. The Metro Government has assigned to the Louisville/Jefferson County Waste Management District all powers or duties given to it by KRS 68.178[.]

**OFF-SITE WASTE MANAGEMENT FACILITIES**

**§ 51.200. LICENSING.**

---

[7] The parties note in the Agreed Statement of Facts that KRS 68.178 does not define "gross receipts," "off-site waste management facilities," "solid waste landfill," or "landfill." DN 27, ¶ 9. This point is discussed later herein.

[8] Various provisions from the Ordinance, which numbers 69 pages in length, are recited for background and discussion, in addition to those quoted in the Agreed Statement of Facts.

(A) All persons involved in the business of operating an off-site waste management facility within the County shall be licensed with the District pursuant to regulations duly adopted by the Board of Directors.

(B) The off-site waste management facility license shall consist, in part, of the filing of a quarterly report with the District pursuant to regulations duly adopted by the Board of Directors.

(C) Types of Facilities:

    (1) Off-site waste management facilities shall be classified and licensed in one of more of the following categories:

        (a) Landfill;
        (b) Solid Waste Management Facility other than a landfill;
        (c) Waste Disposal Facility other than a landfill;
        (d) Recycling Facility; or
        (e) Composting Facility.

## § 51.201. FEE SCHEDULE.

(A) Pursuant to the authority granted by KRS 68.178(1) and in conformity with the home rule power granted to Metro Government, there is hereby imposed an annual license fee for the operation of a recycling facility, solid waste management facility, landfill [or] waste disposal facility, or other waste management business.

(B) The fees for these specific licenses are as follows:

| Type of Facility | License Fee |
| --- | --- |
| | |
| Landfill | 5% per annum of the facility's gross receipts |
| | |
| Waste Disposal Facilities, other than a landfill or recycling facility | 2% per annum of the facility's gross receipts |
| | |
| Solid Waste Management Facilities | 2% per annum of the facility's gross receipts |
| | |
| Recycling and Composting Facilities | $100 application fee and $100 annual renewal fee |
| | |
| Waste Haulers | $100 a year plus $10 per truck |

(C) No license fees may be collected from the Metro Government solid waste collection trucks hauling solid waste to a landfill or transfer station and the license fees provided for in this Section shall not be collected from a landfill or transfer station on solid waste brought into a landfill or transfer station by Metro Government trucks.

## LICENSE APPLICATIONS, FEES AND REPORTS

## § 51.204.  LANDFILL.

(A) Landfill License Application.

　(1) An applicant for a license to operate a landfill shall apply to the Department, at its designated address.

…(B) Landfill License Fee:

　…(2) The licensing fee shall be determined by multiplying the gross receipts of the facility in each quarter of the year by up to five (5%) percent.

…(C)  Required Reporting:

　(1) The licensee shall file a quarter-annual report with the Department which shall accompany payment of the licensing fee…

　　…(d) The gross receipts of the facility for the preceding quarter of the year;

　　(f)  Copy of the Quarterly Landfill Quantity Report…

　(2) Annually…the licensee shall file with the Department, a copy of the form, schedule or other page of its federal tax return showing the gross receipts of the business reported to the federal government for the preceding year…

The Ordinance contains the following definitions:

## § 51.001. DEFINITIONS.

COMPOSTING FACILITIES.  Any site or facility where organic solid waste is biologically decomposed under controlled aerobic conditions that stabilize the organic fraction into a material which can easily and safely be stored, handled, and used in an environmentally acceptable manner…

GROSS RECEIPTS.  The total amount of money or value or other consideration received or generated by engaging in the business or businesses defined in this Ordinance before any deductions related to the cost of doing business.

LANDFILL.  A solid waste management facility, the primary purpose of which is the disposal of solid waste via incorporation into or onto the ground.

RECYCLING FACILITY.  Any facility at which materials which would otherwise become solid waste are collected, separated or processed and reused or returned to use in the form of raw materials or products…

OFF-SITE WASTE MANAGEMENT FACILITY.  Any site or facility whose principal purpose is the treatment, storage or disposal of solid waste, or a combination of these activities but shall not include those treatment, storage or disposal activities which occur incidental to or which are not otherwise distinguishable from a broader manufacturing operation at the site of the operation.

SOLID WASTE.  Any garbage, refuse, sludge or other discarded material, including solid, liquid, semi-solid, or contained gaseous material resulting from industrial, commercial, mining, agricultural operations, and from community activities…

SOLID WASTE MANAGEMENT or WASTE MANAGEMENT.  The administration and/or regulation of solid waste activities; collection, source separation, storage, transportation, transfer, processing, treatment and disposal, which shall be in accordance with a cabinet approved county solid waste management plan.

SOLID WASTE MANAGEMENT FACILITY.  Any facility for the collection, storage, processing, treatment, or disposal of solid waste, excluding:

    (1) A container located on property where solid waste is generated…
    (2) A solid waste management facility which collects, stores, processes, treats or disposes of wastes located on the property where such waste is generated…
    (3) A recovered material processing facility which is subject to regulation pursuant to the chapter for control of environmental impacts and to prevent any public nuisance; and
    (4) A recycling facility.

WASTE DISPOSAL FACILITY.  Any type of waste site or facility where the final disposition of any amount of municipal solid waste occurs, whether or not mixed with or including other waste allowed under subtitle D of the Federal Resource Conservation and Recovery Act of 1976, as amended and includes, but is not limited to, incinerators and waste-to-energy facilities that burn municipal solid waste, and contained in residential landfill…

### III.     Standard of Review

The parties have filed cross-motions for summary judgment referencing an Agreed Statement of Facts. Fed.R.Civ.P. 56(a) states that "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must show that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence ... of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Statutes and ordinances are to be read "as a whole and in context with other parts of the law." *Lewis v. Jackson Energy Co-Op Corp.,* 189 S.W.3d 87, 92 (Ky. 2005). "The words used in a statute are to be given their customary meaning, and the statute is to given effect as written if it is both unambiguous and plain." *Ky. Unemployment Ins. Comm'n v. Providian Agency Group, Inc.*, 981 S.W.2d 138, 140 (Ky.App. 1998).

When both parties move for summary judgment, this Court "must evaluate each motion on its merits and view all facts and inference in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

In *B.F.Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587 (6th Cir. 2001), the United States

Court of Appeals for the Sixth Circuit noted that

> "[t]he fact that both parties make motions for summary judgment…does not require
> the Court to rule that no fact issue exists." *Begnaud v. White*, 170 F.2d 323, 327
> (6th Cir. 1948)(cited with approval in *Cherokee Ins. Co. v. E.W. Blanch Co.,* 66 F.3d
> 117, 122 n. 4 (6th Cir. 1995)). In *Taft Broadcasting Co. v. United States*, 929 F.2d
> 240, 241 (6th Cir. 1991), this court reversed an order granting summary judgment
> on cross-motions for summary judgment and a "stipulated" factual record. The
> court noted that, on cross-motions for summary judgment, "the court must evaluate
> each party's motion on its own merits, taking care in each instance to draw all
> reasonable inferences against the party whose motion is under consideration." *Id.*
> at 248. Differentiating between cross-motions for summary judgment and a trial
> on a stipulated record, the court stated that the filing of cross-motions for summary
> judgment 'does not necessarily mean that the…court is free to treat the case as if it
> was submitted for final resolution on a stipulated record." *Ibid.*<sup>9</sup> …When parties
> file cross-motions for summary judgment, "the making of such inherently
> contradictory claims does not constitute an agreement that if one is rejected the
> other is necessarily justified or that the losing party waives judicial consideration
> and determination whether genuine issues of material fact exist. 10A Charles Alan
> Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720
> (3d ed. 1998). A trial court may conclude, when reviewing the undisputed material
> facts agreed upon by the parties and drawing all inferences, in turn, for the non-
> moving party, that a genuine issue exists as to those material facts, in which case,
> the court is not permitted to resolve the matter, but rather, must allow the case to
> proceed to trial. *See ITCO Corp. v. Michelin Tire Corp. Commercial Div.*, 722 F.2d
> 42, 45 n. 3 (4th Cir. 1983).

245 F.3d at 592-93. As the parties had agreed to the "undisputed" facts, but did not agree as to the

permissible inferences to be drawn from the undisputed facts (245 F.3d at 601 n. 2), the court noted

that summary judgment is not necessarily appropriate solely because the parties filed cross-

motions for summary judgment. 245 F.3d at 593.

---

<sup>9</sup> In footnote, the court in *B.F. Goodrich* noted that when a trial court is ruling on cross-motions for
summary judgment in a nonjury case and the facts are fully developed at a hearing on the motions, the
court may proceed to decide factual issues and render judgment on the merits if it is clear that there is
nothing else to be offered by the parties and there will be no prejudice. This, however, "amounts to a trial
of the action and technically is not a disposition by summary judgment." 245 F.3d at 601 n. 3. While this
is a nonjury case, and the parties have filed an Agreed Statement of Facts, this matter is before the court
on dispositive motion practice and nothing more. To the extent that the agreed facts facilitate a
determination by this court of questions of law, these legal questions will be decided on summary
judgment. However, the court will not resolve disputes of material fact, if any, which prove to be
necessary prerequisites to resolution of issues in this case.

In the case at bar, the parties stipulate to the language in the enabling statute and Ordinance, but disagree on the implications that flow from the language. The parties stipulate as to the license payments made by WMK and the method employed to calculate the amount owed, but they dispute the correctness of the calculations and payments. They stipulate that WMK was transparent about its deductions, noting on each report the receipts it excluded in reaching a total "gross receipts" for purposes of calculating the 5% landfill licensing fee. The parties disagree as to the propriety of these exclusions under the Ordinance. The parties stipulate that reports and payments were made by WMK and accepted by the District for the past thirteen years, but they disagree as to the import of this fact.

## IV.    Analysis

The District contends that the Ordinance clearly and unambiguously authorizes the collection of the fees it seeks. It urges that the Ordinance permits the collection of a licensing fee of up to 5% per annum of the gross receipts of the entire Outer Loop Facility insofar as its primary purpose is the operation of a landfill facility. The District contends that the language of the Ordinance is in harmony with KRS 68.178. It argues that since the Ordinance clearly and unambiguously defines "gross receipts" as "the total amount of money or value or other consideration received or generated by engaging in the business or businesses defined in this Ordinance before any deductions related to the cost of doing business," the licensing fee permitted by the Ordinance is based on *all* of the Outer Loop Facility's receipts, no matter how generated.

WMK contends that the Ordinance conflicts with its enabling statute, KRS 68.178, and is thus invalid and unenforceable, citing, among other cases, *Ky. Restaurant Ass'n v. Louisville/Jefferson County Metro Gov't*, 501 S.W.3d 425 (Ky. 2016); *Greater*

*Cincinnati/Northern Ky. Apartment Ass'n. v. Campbell Cnty. Fiscal Court*, 479 S.W.3d 603, 605 (Ky. 2015). WMK further claims that the District's application of the Ordinance with respect to WMK's landfill license is contrary to the Ordinance itself. Finally, WMK urges that the District's current proposed application of the Ordinance to WMK's operations is contrary to its prior longstanding acceptance of WMK's calculation of its gross receipts and payment of the license fee based on those calculations and should preclude the District from challenging those calculations now.

In large measure, the arguments made in the summary judgment motions are reflected again in their responsive briefs. As the arguments are intertwined, we will attempt to address the parties' arguments in a logical, if not sequential, order.

A. **Introduction.**

WMK sought and was granted licenses, under the County's licensing scheme, to operate an Off-Site Waste Management Facility on its Outer Loop property. The parties agree that WMK's operations on the Outer Loop property constitute an "Off-Site Waste Management Facility" subject to the licensing provisions of the Ordinance.

"Off-Site Waste Management Facility" is defined as "any site or facility whose principal purpose is the treatment, storage or disposal of solid waste, or a combination of these activities…" Indeed, but for WMK's operation of an Off-Site Waste Management Facility, WMK would not have applied for, received, and renewed the licenses it holds and we would not be here addressing this dispute. At the risk of restating the obvious, the parties agree that the principal purpose of WMK's operations on the Outer Loop property is the treatment, storage or disposal of solid waste, or a combination of these activities.

The language in the Ordinance's definition of "Off-Site Waste Management Facility" mirrors the language of KRS 68.178(1) and thus permissibly distinguishes off-site waste management from other-purposed facilities for purposes of licensing solid waste management operations.

It is mandatory that "[a]ll persons involved in the business of operating an off-site waste management facility within the County…be licensed…" § 51.200(A).

Section 51.200(C) requires that all off-site waste management facilities be "classified and licensed" in one or more of five designated categories. No party in this case challenges the County's authority to require an operator to be classified in more than one category of operation where appropriate. In fact, WMK maintains licenses to conduct landfill and composting operations. [10]

An operator of an "Off-Site Waste Management Facility" must identify which category or categories govern its operations and apply for the appropriate license or licenses to engage in those activities.

A facility must be classified in one or more of the following categories: (a) Landfill; (b) Solid Waste Management Facility other than a landfill; (c) Waste Disposal Facility other than a landfill; (d) Recycling Facility; or (e) Composting Facility. We address each of these categories in turn.

WMK composts on the Outer Loop Property and is licensed for this operation. DN 27, ¶ 6. "Composting Facilit[y]" is defined in the Ordinance as "[a]ny site or facility where organic

_____

[10] WMK also pays a license fee for hauling solid waste at a rate of $100 per year plus $10 per truck. § 51.201(B). The propriety of this license fee is not challenged so we will not linger over this point beyond noting that solid waste haulers, of which WMK is apparently one, fall under the broader categories of "Solid Waste Management Facility" and "Waste Disposal Facility" which, in turn, fall under the category of "Off-Site Waste Management Facility," the regulation of which is authorized by KRS 68.178(1).

solid waste is biologically decomposed under controlled aerobic conditions that stabilize the organic fraction into a material which can easily and safely be stored, handled, and used in an environmentally acceptable manner." § 51.001. The "solid waste" of which the definition speaks is "any garbage, refuse, sludge and other discarded material, including solid, liquid, semi-solid, or contained gaseous material resulting from industrial, commercial, mining, agricultural operations and from community activities..." *Id.* It is undisputed that the Outer Loop Facility is properly categorized as a "Composting Facility" and properly pays the annual license fee therefore.

Apparently, the Outer Loop Facility is not categorized as a "Recycling Facility," as it carries no license for recycling operations.

WMK obtained a license to operate a "Landfill," and is required to pay a license fee of 5% per annum of the facility's gross receipts. § 51.201(B). WMK admits that it operates a landfill on the Outer Loop property and must be licensed to do so, contending that it has properly paid 5% of the landfill's gross receipts each year.

The categories of "Solid Waste Management Facility other than a landfill" and "Waste Disposal Facility other than a landfill" carry with them a license fee of 2% per annum of the facility's gross receipts.

The three classifications  -- "Landfill," "Solid Waste Management Facility other than a landfill," and "Waste Disposal Facility other than a landfill" --  must be considered together and reconciled in context in § 51.200(C) and viewed in light of the Ordinance as a whole to give effect, if possible, to all terms in the Ordinance in context.

The Ordinance defines "Solid Waste Management Facility" as "[a]ny facility for the collection, storage, processing, treatment, or disposal of solid waste," excluding certain containers, generators of solid waste who manage their waste on site, recovered material processing facilities,

and recycling facilities. § 51.001. A "Waste Disposal Facility" is defined by the Ordinance as "[a]ny type of waste site or facility where the final disposition of any amount of municipal solid waste occurs, whether or not mixed with or including other waste…" as described, includes incinerators, waste-to-energy facilities, and residential landfills, but excludes solid waste generators' own disposal facilities and medical waste incinerators. *Id.* Any Off-Site Waste Management Facility falling under one of these two categories is subject to a license fee of 2% per annum of the facility's gross receipts.[11]

Solid Waste Management Facilities and Waste Disposal Facilities are distinguished from Landfills for purposes of classification. "Landfill" is defined in the Ordinance as "[a] solid waste management facility, the primary purpose of which is the disposal of solid waste via incorporation into or onto the ground." § 51.001. It is undisputed that a landfill is a type of solid waste management facility, despite WMK's challenge to the Ordinance's definition of the term "landfill." DN 35, p. 5 ("While a landfill is a type of solid waste management facility, the District now attempts to expand the scope, breadth, and monetary recovery…").

That "Landfill" is a particular type of "Solid Waste Management Facility" under the Ordinance is apparent from the categories themselves. (Compare "Landfill" with "Solid Waste Management Facility other than a landfill.")

Therefore, under a plain reading of the Ordinance, an off-site waste management facility for the collection, storage, processing, treatment or disposal of solid waste is categorized as a "Waste Disposal Facility" or "Solid Waste Management Facility" unless that facility has as its

---

[11] The categorical distinction between these two categories is of no significance in this discussion, as they are treated similarly with respect to the percentage license fee imposed.

primary purpose the disposal of solid waste via incorporation into or onto the ground, in which case the facility is categorized as a "Landfill."

The Ordinance requires the licensing of all persons engaged in the business of operating an off-site waste management facility (Section 51.200(A)); the classification of such an off-site waste management facility in one or more of five categories for purposes of licensing (§ 51.200(C)); the imposition of a license fee for the operation of the various types of waste management facility categories (§ 57.201(A)) at the rates set out for each type of facility (§ 51.201(B)).

The Court discusses later in this opinion WMK's arguments (1) that this licensing structure exceeds the authority granted the County by KRS 68.178, and (2) that the landfill operation's receipts should be segregated from the other (non-landfill) receipts, for purposes of the calculation of the landfill license fee. For purposes of this introductory section, however, we note only that an Off-Site Waste Management Facility cannot be categorized as a solid waste management facility that is both a landfill and not a landfill under § 51.200(C). A facility must be categorized as one or the other for purposes of licensing, depending upon whether the solid waste management facility's landfill operations, if any, constitute its primary purpose. We also not that the Ordinance requires the licensing of particular waste management operations simultaneously where these operations are conducted at one facility.


**B. Effect of KRS 413.120 Five-Year Statute of Limitations.**

KRS 413.120 provides a five-year limitations period for "[a]n action upon a liability created by statute, when no other time is fixed by the statute creating the liability." This limitation has been applied by Kentucky courts to the collection of delinquent license fees. *See Lexington-*

*Fayette Urban County Government v. Abney*, 748 S.W.2d 376 (Ky.App. 1988). No issue exists concerning the application of the statute of limitations. The District concedes in response to WMK's motion for summary judgment that its claim for damages may only extend back five years to May 17, 2012. It states that it "does not dispute application of the 5-year limitation on actions contained in KRS 413.120." DN 36, p. 8. Therefore, no fees or other damages may be recovered by the District in this action for any period prior to May 17, 2012.

### C. Ordinance § 51.201 – Does it conflict with KRS 68.178 such that it is rendered invalid and unenforceable?

WMK contends that KRS 68.178 precludes the District from imposing a license fee of 5% per annum on the gross receipts of WMK's entire Outer Loop Facility. The Court agrees that the enabling statute does not permit the County to collect a landfill license fee in excess of 5% of the gross receipts of the landfill. However, we also find that when KRS 68.178 and the Ordinance are read as a whole, giving effect to all terms of their respective provisions, the Ordinance does not conflict with the terms of the statute.

The Supreme Court of Kentucky noted in *Ky. Rest. Ass'n v. Louisville/Jefferson Cty. Metro Gov't*, 501 S.W.3d 425 (Ky. 2016), that KRS 82.082 and KRS Chapter 83 vest local governments with broad authority (known as "Home Rule"). KRS 82.082 provides: "(1) A city may exercise any power and perform any function within its boundaries…that is in furtherance of a public purpose of the city and not in conflict with a constitutional provision or statute. (2) A power or function is in conflict with a statute if it is expressly prohibited by a statute or there is a comprehensive scheme of legislation on the same general subject embodied in the Kentucky Revised Statutes…"

WMK urges that the scope, effect, and consequences of the Ordinance conflict with its enabling statute rendering the Ordinance invalid for violation of KRS 82.082(2) and the Kentucky Constitution § 156b.[12]

**(1) KRS 68.178 -- Is a "landfill" under subsection (2) a "facility" under subsection (1) such that the definition of "Landfill" in the Ordinance is consistent with and authorized by the enabling statute?**

The Court must consider the structure of KRS 68.178 and the language employed by the legislature in crafting the statute. "It is a primary rule of statutory construction that no single word or sentence determines the meaning of a statute. Rather, the statute as a whole must be considered." *Lexington Fayette Cty. Food & Bev. Ass'n. v. Lexington Fayette Urban Cty. Gv't.,* 131 S.W.3d 745, 750 (Ky. 2004)(internal citations omitted). "The words used in a statute are to be given their customary meaning, and the statute is to given effect as written if it is both unambiguous and plain." *Ky. Unemployment Ins. Comm'n v. Providian Agency Group, Inc.*, 981 S.W.2d 138, 140 (Ky.App. 1998).

KRS 68.178(1) provides that a "solid waste management facility" license fee may not exceed 2% per annum of such a waste management facility's gross receipts. KRS 68.178(2)(a) provides that a "solid waste landfill" license fee may not exceed 5% of a landfill's gross receipts.

The legislature used the word "facility" in KRS 68.178(1):

The fiscal court of any county may license off-site waste management facilities located within the county with the imposition of a license fee at a rate not to exceed two percent (2%) per annum of the gross receipts *of such waste management facility…*

[12] Section 156b of the Kentucky Constitution states: "The General Assembly may provide by general law that cities may exercise any power and perform any function within their boundaries that is in furtherance of a public purpose of a city and not in conflict with a constitutional provision or statute." *See also Ky. Rest. Ass'n*, 501 S.W.3d at 427.

and did not in KRS 68.178(2):

> The fiscal court of a county…may license a solid waste landfill located within the county…The license fee may be set at…up to 5% *of the gross receipts of the landfill.* (emphasis added).
> Much is made by WMK, and correspondingly minimized by the District, of the presence

in subsection (1) and absence in subsection (2) of the word "facility."

WMK contends that the statute clearly distinguishes between a "landfill" fee and a "facility" fee. "Landfill" is undefined in the statute, but WMK argues that the "facility" of subsection (1) is not the "landfill" of (2)(a). It contends that the Ordinance impermissibly conflates "landfill" and "facility" in imposing the 5% landfill license fee and thus the Ordinance conflicts with the enabling statute.

The statute authorizes a higher license fee for the operation of a landfill as opposed to other types of off-site waste management facilities. The parties agree that the license fees authorized by subsections (1) and (2)(a) of 68.178 (1) provide for the collection of different percentages of gross receipts, depending upon the facility or facilities being licensed, (2) provide for differing uses for the revenue collected,[13] and that (3) the subsections authorize certain county entities to adopt licensing ordinances in exercise of this authority.[14]

---

[13] This is only partly true, as both subsections direct revenues to the general funds of local government, however (2)(c) directs that the revenues from landfill operations also be used for services provided to landfill, landfill cleanup, landfill emergency services, and necessary maintenance, improvement, and construction of roads as well as the general revenue requirements of the county.

[14] In its opening brief, WMK urges that the Ordinance exceeds the authority authorized by KRS 68.178 because only the fiscal court of a county may adopt an ordinance under KRS 68.178(1), not an urban-county government.  DN 31-1, p. 14. This argument is premised on the assumption that Louisville/Jefferson County Metro Government ("Louisville Metro") is an urban county government. The District pointed out in response that, in fact, Louisville Metro is not an urban-county government, but rather is a consolidated local government created pursuant to KRS 67C.101 *et seq.* and has "those powers granted to cities of the first class and their counties under their respective home rule powers." KRS 67C.101(2)(a). With the authority of counties, Louisville Metro has both the authority and history of exercising powers pursuant to both KRS 68.178(1) and 68.178(2)."  DN 36, pp. 3-4. WMK did not address the point in their reply, so we deem the challenge to Louisville Metro's authority to enact the licensing Ordinance abandoned.

WMK seeks to capitalize on these differences, characterizing section (1) as authorizing a "facility" license fee and (2)(a) as authorizing a "landfill" license fee, suggesting that a "landfill" fee of 5% and a "facility" fee of 2% are distinct. This is true to the extent that WMK's term "'facility' fee" means an off-site waste management facility other than the "landfill" of subsection (2)(a). As such, the fees are, indeed, "distinct." It does not follow, however, that a "landfill" is not a "facility" under the statute, albeit a certain type of facility.

Section 68.178 provides the authorization to counties to license off-site facilities whose principal purpose is the treatment, storage or disposal of waste or a combination of those activities and to charge a license fee therefore. Subsection (1) sets a maximum percentage rate of 2% per annum of the gross receipts of such a facility. However, a County may license a landfill under subsection (2)(a) at a maximum percentage rate of 5%, subsection (2)(d) stating that "[t]he [5%] fee provided for in this subsection shall be in lieu of the provisions of subsection (1)." We look to the statute as a whole, giving effect to all terms in context. Subsection (2)(d) would be rendered meaningless if subsections (1) and (2) are read as wholly unrelated provisions. Rather, we find that solid waste landfills, a type of off-site waste management facility, are subject to a higher license fee (up to 5% of gross receipts of the landfill) to defray additional, specific costs to the County, listed in KRS 68.178(2)(c), which are associated with the operation of landfills.

The Ordinance's licensing scheme, mirroring the structure of the enabling statute, allows for the classification of a waste management facility as a "Landfill" or as a solid waste management facility or waste disposal facility "other than a landfill." § 51.200(C). When an operator of a facility has as its primary purpose the operation of a landfill, the operator will be licensed at the rate of 5% of the gross receipts received or generated by engaging in the business of operating the

landfill.[15] We do not find any conflation of the 2% and 5% fees, and thus find no conflict with the enabling statute. Additionally, we do not find any internal consistency within the Ordinance in this regard. Rather, we find that the District's attempt to extend the reach of the Ordinance is where the problem lies.

With respect to § 51.201 which imposes the license fees, the District contends that § 51.201(B) authorizes the assessment of a 5% license fee on the gross receipts of the entire Outer Loop Facility. It urges that the presence or absence of the term "facility" changes nothing, and that the primary purpose of the Outer Loop Facility renders it subject to the 5% fee on all receipts generated at the Outer Loop Facility. We agree with the District that the presence or absence of the term "facility" changes nothing. However, what receipts the District may capture under the terms of the Ordinance is a separate question.

WMK proposes that the County's use of the term "facility" in the fee schedule, § 51.201(B), impermissibly extends the reach of the "landfill" license fee authorized by KRS 68.178(2)(a) insofar as it imposes a landfill fee of "5% per annum of the *facility's* gross receipts." [emphasis added]. In reading the Ordinance as a whole and considering the sections in context, we do not find that subsection 51.201(B)'s use of the term impermissibly extends the reach of the Ordinance, but rather is the District's proposed application that is the impermissible extension.

We agree with WMK that the Ordinance does not justify an extension of the landfill license fee to all gross receipts of the Outer Loop Facility, no matter what they are or how they are generated. Such an application of the license fee provision would conflict with a plain reading of KRS 68.178(2)(a) which permits the imposition of a 5% on the gross receipts of the landfill. We conclude that neither the Ordinance nor the enabling statute permits the wholesale absorption of

---

[15] This language is taken from the definition of "Landfill" read in conjunction with the definition of "Gross Receipts" set out in the Ordinance.

any and all of the Outer Loop Facility's receipts into "gross receipts" even though the Outer Loop Facility's primary purpose is the operation of a landfill. The categorization of a facility as a "Landfill" based upon its primary purpose under the Ordinance merely determines the type of facility being licensed. The fee was and will remain a landfill license fee, not a fee which can be based on all receipts as a matter of definition, unless, of course, the receipts are received or generated by engaging in the business of operating a landfill.

The use of the term "facility" does not alter our analysis. As the District contends, the inclusion of "facility" in the Ordinance's definition of "Landfill" is benign. The District notes that the common, ordinary meanings of the term "facility" ("something created to serve a particular function <a new mental health *facility*>")[16] simply connotes an association between a place and the activities or operations performed or occurring there. Among its common, ordinary meanings, "facility" can be "an area with definite or indefinite boundaries,"[17] that is, a place defined geographically; or "an area occupied by or set aside for a specific person or purpose;"[18] that is, a place identified by its association with a person or purpose. The enabling statute and the Ordinance identify a designated purpose at a location rather than focusing solely on geographic boundaries. In fact, licensing operations conducted at a locale is what the statute authorizes and the Ordinance implements. *See* KRS 68.178(1):

> For purposes of assessing the license fee provided for in this section,[19] *off-site waste management* shall consist of *establishing and operating* a facility whose principal purpose is treatment, storage, disposal [of waste], or a combination of these activities.
>
> (emphasis added).

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] "This section" being Section 68.178 in its entirety, not simply subsection (1).

*See* § 51.200(A):

> All persons involved *in the business of operating* an off-site waste management facility within the County shall be licensed…

(emphasis added).

Focusing solely on the word "facility" without considering its use in context is unhelpful, if not misleading.

As "landfill" is not defined in KRS 68.178(2)(a), the employment of the term's common, ordinary meaning in the Ordinance is proper. The definition distinguishes a landfill from other solid waste management facilities in light of the method of operation which involves "disposal of solid waste via incorporation into or onto the ground." Thus, where the primary purpose[20] of a solid waste management facility is the operation of landfill, the County has determined to assess a license fee of 5% of the total amount of money or value or other consideration received or generated by engaging in the business of operating that landfill.

At its essence, this case is about whether fifteen categories of receipts were properly excluded from the "gross receipts" reported to the County and upon which the 5% landfill license fee for operating the landfill was based. Whether 5% of these receipts is collectible as underpaid license fees remains to be determined on a more fully developed record.

In sum, under the scheme of the Ordinance, only those solid waste management facilities whose primary purpose is disposal of solid waste by landfill are subject to a 5% landfill license fee. This approach is consistent with KRS 68.178 insofar as (1) subsection (2)(a) is silent as to a county's method of discerning what facilities are subject to the license fee. The statute merely provides that solid waste landfills may be subject to a 5% license fee on the gross receipts of the landfill.

---

[20]WMK claims that "primary purpose" is vague. The common, ordinary meaning of "primary" is "principal, as in the primary purpose."[20] We find no vagueness here.

Thus, the Court concludes that the Ordinance's definition of "Landfill" and its imposition of the 5% license fee do not conflict with or exceed the authority granted by KRS 68.178. The Ordinance is clear and unambiguous, and it is in harmony with the language and licensing scheme authorized by the enabling statute.

### (2) "Gross Receipts" – Properly Defined?

In the Ordinance "Gross Receipts" are defined as "[t]he total amount of money or value or other consideration received or generated by engaging in the business or businesses defined in this Ordinance before any deductions related to the cost of doing business." § 51.001.

KRS 68.178 does not define "Gross Receipts." Rather, it authorizes a county to license off-site waste management facilities located within the county "with the imposition of a license fee at a percentage rate not to exceed (2%) per annum[21] of the gross receipts of such a *waste management facility owned or operated by self-employed individuals, partnerships, or corporations.*" KRS 68.178(1)(emphasis ours). As previously noted, "[f]or purposes of assessing the licensing fee provided for in this section,[22] *off-site waste management shall consist of the establishing and operating a facility* whose principal purpose is treatment, storage, disposal, or a combination of those activities…" *Id.* (emphasis ours). In other words, engaging in the business of off-site waste management.

WMK does not take issue with the definition of "Gross Receipts" in the Ordinance. Rather it disputes the proposed application of that definition to WMK's operations. The parties attached documents of Waste Management Advisory Committee Group A's research on "Gross Receipts"

---

[21] Or 5% per annum in the case of an off-site waste management facility that constitutes a landfill under subsection (2).

[22] That is, section 68.178 providing for imposition of a county license fee for off-site waste management facilities.

which indicate that the definition comports with the usage of the term in Jefferson County: "It is understood that in Jefferson County Gross Receipts are defined as any and all monies taken in through business operations, sales, and services provided. Gross receipts are calculated before any deductions for business expenses have been made. There are no approved deductions for gross receipts." DN 27, Ex. 4.[23]

There is no question that KRS 68.178 authorizes the assessment of a license fee for the establishment and operation of a facility at a percentage rate tied to the type of waste management facility operated and the gross receipts generated thereby. KRS 68.178(1) and (2). The Ordinance's definition of "Gross Receipts" which includes the "money, value, or other consideration received or generated by engaging in the business or businesses defined in the Ordinance" comports with and does not exceed the authority granted by KRS 68.178.


### D. "Gross Receipts" – Properly Applied?

WMK urges that, if the Court does not conclude that the Ordinance is hopelessly in conflict with the enabling statute and thus void and unenforceable, the District's attempt to sweep into the net of "Gross Receipts" *all* of the Outer Loop Facility receipts impermissibly expands the scope of the Ordinance to include "non-landfill" operations in the otherwise authorized landfill license fee. It contends that it correctly excluded receipts for operations other than what it determined were its "landfill operations." We do not have enough information to make this determination. The

---

[23] In November of 2015, the District Advisory Committee Group A was tasked with drafting language to potentially better define the term "Gross Receipts." No update was ever approved or enacted. This information is therefore anecdotal only, as WMK does not contend that the concerns explored by this advisory group have the power to render the definition infirm.

Court cannot merely accept at face value WMK's assertion that the receipts were properly excluded from the gross receipts reports, or the District's assertion otherwise.

The District notes that WMK does not operate separate businesses on the Outer Loop Property, but it does engage in various operations which require separate licenses, such as composting and waste hauling. WMK apparently does not keep separate records nor file separate tax returns for the various operations conducted on the property. WMK has not provided any copies of federal tax returns, forms, or schedules as required by the Ordinance in conjunction with its calculation of the Outer Loop Facility's gross receipts, purportedly because WMK does not distinguish the Outer Loop Facility from a larger state-wide taxable entity.

WMK suggests that because it pays for additional license fees for composting and waste hauling, the licenses are separate and distinct, and receipts from these operations should be excluded. However, the Outer Loop Facility is simultaneously a landfill, composting and waste hauling facility by classification under § 51.200(C) and is licensed as such. We reject WMK's assertion that these operations should be found mutually exclusive because WMK holds several licenses.

We note additionally that WMK's focuses, in part on the geography of the facility, urging that only two-thirds (518.30 acres) of the property (782.10 acres in total, depicted in an aerial photograph) is permitted by the Kentucky Department for Environmental Protection, Division of Waste Management (KDEP) for solid waste disposal in a landfill under Permit #SW05600028. WMK urges that the "facility" subject to the license fee should only be imposed on the portion of the Outer Loop property upon which the "actual landfill where waste is deposited and left in the ground." DN 31-1, p. 24. However, no physical portion of the land are designated on the aerial photograph as "landfill." Further, the District dismisses WMK's attempt to geographically

partition the Outer Loop Facility as "landfill" and "non-landfill" operations, noting that much of the remaining third of the non-permitted acreage is not presently utilized for any operations at all.

The licenses authorized by statute and issued under the Ordinance are required for the operation of various waste management businesses. § 51.201(A). We reject the assertion that "landfill" and "non-landfill" operations can be determined by mathematical proportion or geographical location. It is the gross receipts generated or received by engaging in the business of operating the landfill that form the basis upon which the license fee is calculated.

In sum, the Outer Loop Facility is a "Landfill" for licensing purposes and the license fee for operating it is 5% of the "Gross Receipts," or in other words, 5% of the "total amount of money or value or other consideration received or generated by engaging in the business" of operating the landfill. As already discussed at length, both the Ordinance and the enabling statute contemplate the combination of operations conducted at an off-site waste management facility. The primary or principal purpose of the facility establishes whether it must be licensed for off-site waste management operations at all and, if so, what license or licenses are required. The Ordinance's directive is clear and unqualified. The definition of "Gross Receipts," giving its terms their common, ordinary meaning, requires the payment of a license fee based upon the gross receipts received from engaging in the business for which the license is required, no more and no less.[24]

Finally, WMK raises a policy argument that the District's proposed application of the 5% fee to the gross receipts of the entire facility is contrary to the express intention of the Commonwealth to focus on greener alternatives in the solid waste disposal arena. WMK urges

---

[24] The District also focuses on the last portion of the definition which indicates that the gross receipts figure is to be calculated before any deductions are taken related to the cost of doing business. We need not say much on that point. The question posed here is not whether expenses incurred in the business of operating a landfill may be deducted from the gross receipts. Clearly, the language indicates that "gross" means "gross," not "Net." That is beside the point. The issue is whether the receipts *excluded* from the gross total are in fact money or value received or generated by engaging in the business, and thus properly includable.

that to impose the higher landfill license fee on the gross receipts of the entire Outer Loop Facility

fails to encourage environmentally friendly alternatives which bear a much lower license fee, such

as recycling and composting.  However, the license fee is imposed in order to provide the County

the revenue needed to address, *inter alia*, the unique costs to the County presented by a landfill

operation.


**E.  Contemporaneous Construction – Does this Doctrine Bar the District's Claim for Underpaid License Fees?**

WMK contends that the District's prior course of conduct in failing to question the

calculation of the gross receipts and in accepting the landfill license fee payments bars it from

claiming past fees.

In *Delta Airlines, Inc. v. Comm. Of Ky. Revenue Cabinet*, 689 S.W.2d 14 (Ky. 1985), the

Supreme Court of Kentucky stated that "[t]he failure of a public officer to correctly administer the

law does not prevent a more diligent and efficient public administrator to bring into the revenue

proper subjects of taxation.  An erroneous interpretation of the law will not be perpetuated." *Id.*

at 20, citing *City of Louisville v. Board of Education,* 356 S.W.2d 247 (Ky. 1962).

> Contemporaneous construction cannot be founded upon an administrative agency's
> failure to correctly apply the law. *Delta Airlines, Inc. v. Revenue Cabinet*, LY. 689
> S.W.2d 14, 19-20 (1985).  The doctrine of contemporaneous construction is a
> judicial tool for statutory construction.  This Court stated in *Commonwealth ex rel.
> Huntsman v. Kentucky Distilleries & Warehouse Co.,* 143 KY 314, 136 S.W. 1032,
> 1039-40 (1911), "[M]ere nonaction upon the part of the officers of the state is not
> to be treated as contemporaneous construction."  Nor can the Cabinet change the
> law through mistake.

*Revenue Cabinet, Comm. Of Ky. v. Lazarus, Inc.*, 49 S.W.3d 172, 175 (Ky. 2001). "An unambiguous statute is to be applied without resort to any outside aids." *Delta Airlines*, 689 S,W.2d at 19.

When an administrative agency "has the responsibility of interpreting a statute that is in some manner ambiguous, the agency is restricted to any long-standing construction of the provisions of the statute it has made previously." *Lazarus, Inc.*, 49 S.W.3d at 174.

The Court has found that KRS 68.178 and LMCO § 51 are unambiguous. We have applied the common, ordinary meaning to the terms and clearly and easily identified their application within the context of the statute and Ordinance, respectively.

We also discerned no conflict between the two when comparing them, finding no extension in the Ordinance beyond the bounds of the authority granted by the statute. Creative arguments do not ambiguities render. The Ordinance is in harmony with the language, meaning, and authority of the enabling statute, KRS 68.178.

As there is no ambiguity, the doctrine of contemporaneous construction is inapplicable in this case. *Delta Airlines, Inc., supra.; Lazarus, Inc., supra.* Further, the County's inaction with regard to WMK's calculations of the Outer Loop Facility's "Gross Receipts, acceptance of the payments made and inaction on the proposed change to the definition of "gross receipts" cannot be treated as contemporaneous construction by the County. *Id.* The District is within its power; indeed, its obligation, to seek the unpaid portion of the landfill license fees, if any.

Therefore, for the reasons set forth hereinabove, a separate order will be entered herein this date granting in part and denying in part the cross-motions for summary judgment.

**IT IS SO ORDERED.**

September 26, 2019



30

**Charles R. Simpson III, Senior Judge**
**United States District Court**